IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NILO WATCH PARTS. INC.,

Plaintiff,

v.

RADO WATCH CO., LTD.,

Defendant.

CIVIL NO. 23-1085 (CVR)

**OPINION AND ORDER**

**INTRODUCTION**

On February 23, 2023, Plaintiff Nilo Watch Parts, Inc. ("Plaintiff" or "Nilo") filed a Verified Complaint asserting a claim of unlawful termination of a distributorship pursuant to Act 75 of June 24, 1964, as amended, P.R. Laws Ann., tit 10, §278 *et seq*. ("Law 75" or "the Act"). (Docket No. 1).  On that same date, Nilo filed a "Motion for Injunctive Relief" seeking an order compelling Defendant Rado Watch Co. Ltd. ("Defendant" or "Rado") to continue the "business between the parties" until the end of this litigation.  (Docket No. 2 at p. 6).  On June 8, 2023, Rado answered the Complaint and also filed an opposition to the request for injunctive relief.  (Docket Nos. 14 and 15). On June 21, 2023, Nilo filed its reply to Rado's opposition.  (Docket No. 21).

The Court subsequently scheduled a preliminary injunction hearing, which was held on August 16, 2023 and continued during the morning of August 17, 2023.  (Docket Nos. 29, 36 and 37).  Plaintiff Nilo presented as a witness Ms. Yasmine Hussein ("Ms. Hussein"), Nilo's Vice-President, Board Secretary and shareholder, and proffered the testimony of Ms. Heidie Calero as an expert witness to testify about the overall economic

conditions in Puerto Rico. The Court denied the expert witness' proffered testimony because it would not have helped the Court "to understand the evidence or to determine a fact in issue." See Fed. R. Evid. 702(a) (Docket No. 36). Defendant Rado presented as witnesses Mr. Adrian Bosshard, Rado's Chief Executive Officer, and Mr. Miguel Ortiz, Rado's Brand Manager for the United States and the Caribbean. (Docket Nos. 36 and 37).

For the reasons set forth below, the Court finds that Plaintiff Nilo has failed to show that it is entitled to the extraordinary remedy of a *pendente lite* injunction. Therefore, Nilo's request for preliminary injunctive relief is DENIED. (Docket No. 2)

### FINDINGS OF FACT

The Court makes the following findings of fact based on the testimonies offered during the hearing and the documents admitted into evidence at that time, and for the limited purpose of addressing Nilo's request for injunctive relief.

1. Rado is a watch-making entity that is part of the Swiss watch conglomerate Swatch Group. (Testimony of Mr. Adrian Bosshard).

2. Rado is known world-wide for its use of high-tech materials in the manufacture of high-range luxury watches. Id.

3. Among the many watch models for which Rado is known worldwide are the "Captain Cook" series, representing approximately 20% of its worldwide sales; the "True" series representing approximately 25%-30% of its worldwide sales; and the "DiaStar" or "Original" line of products, which worldwide represents approximately 10%-15% of its sales. (Testimony of Mr. Adrian Bosshard; Exhibit A).

4. To assist its "agents" or distributors worldwide, Rado has for many years consistently provided them with concrete sales and marketing guidelines for their operations to carry the same message globally. Id.

5. Among the many matters covered by those guidelines are:

   a. Rado "needs a selective, qualitative distribution network to succeed." (Testimony of Mr. Adrian Bosshard; Exhibit B at p. 4).

   b. Rado's Points-of-Sales or "POS" must be "centrally located in fine surroundings with strong customer traffic." (Exhibit B at p. 5).

   c. Rado's products "should be placed near other Premium Swiss brands of the same or a higher price level" in what is known in the industry as the "Swiss Environment." (Testimony of Mr. Miguel Ortiz; Exhibit B at p. 5).

   d. Rado's "defined core collection … must always be available in every POS." (Exhibit B at p. 6).

   e. Rado's POS need adequately trained staff who can be "ambassadors" for the brand. (Testimonies of Mr. Adrian Bosshard and Mr. Miguel Ortiz; Exhibit B at p. 7).

6. The guidelines also provide concrete marketing materials and strategies acceptable to Rado and the approved retail design concepts. (Exhibit B at pp. 8-15).

7. On April 28, 1987, Rado and Rado Watch Co., Ltd. executed a letter of intent with Nilo. (Stipulation of Facts at ¶ 1; Joint Exhibit I).

8.  On June 4, 1987, John J. Hubacher, then President of Rado, sent a letter agreement to Mr. Ali Hussein, Nilo's then-President, recognizing Nilo as "the sole distributor and agent for Rado Watches for the territory of Puerto Rico." (Stipulation of Facts at ¶ 2; Joint Exhibit II).

9.  Nilo operated as Rado's sole distributor in Puerto Rico from 1987 until December 31, 2022, when Rado's decision to terminate the relationship became effective.  (Joint Exhibit III).

10.  While earlier sales had been overall satisfactory, by 2008, Rado had become concerned with a decrease in sales and reached out to Nilo to address these concerns.  Thus, on September 25, 2008, Rado sent a letter to Nilo requiring certain changes take place "urgently and with utmost priority."  (Exhibit D at p. 1).

11.  Among the various changes that Nilo was asked to implement were the "hiring of a new, dynamic Brand Manager", to "open new image doors such as for example Bared, etc." and to "open a RADO Franchise Store in the mall of the Americas *[sic]* by the latest March 30th, 2009."  Id.

12.  Nilo responded on October 9, 2008, and rejected the need for any of the marketing measures Rado sought to implement.  Nilo "strongly" disagreed with the letter, and claimed that Rado's worldwide decisions regarding its models, prices, placements or promotions did "not comport with Nilo's local knowledge and experience."  (Exhibit E).

13.  Nilo further claimed that "Bared was not interested in Rado's proposal" and that Rado had rejected a Plaza Las Americas' franchise store proposal carried

out by Nilo in 2007, "because of the expenses Rado would have had to incur." Id.

14. Rado reacted with a subsequent letter dated November 17, 2008.  (Exhibit F).

15. With respect to the areas of improvement of Nilo's distribution network, Rado acknowledged "that the suggested proposal [for the Rado Store] was commercially too expensive," but asserted it "never communicated to [Nilo] to stop the search for other alternatives."  Id.

16. With regards to a potential relationship with Bared jewelers, Rado countered that Bared had given "clear signals during the last meeting with [Nilo] and [Rado's representative] Christian Mahlke that they [were] interested to discuss an eventual collaboration for 2009."  Id.  Rado further explained that it did not understand why Nilo was "so negative with respect to this additional opportunity."  Id.

17. Regardless of the difference of opinion between Nilo and Rado about the quality of Nilo's distribution efforts during 2008, Nilo's purchase from Rado in 2008 was of 7,364 units, valued at 2,862,742.00 Swiss francs, lower than in 2007.  (Exhibit C).

18. Yearly sales from Rado to Nilo continued to decline on an annual basis from 2009 to 2013.  Id.

19. Nilo eventually moved its offices from where it had started out originally in Río Piedras to new facilities in Galería San Patricio, as requested by Rado back in 2008.  (Testimony of Ms. Yasmine Hussein; Exhibit D).

20. Nilo has a retail Rado shop-in-shop ("SIS") at the ground level of Galería San

Patricio as well as a Swatch brand SIS, facing each other.  (Id; Exhibits 15 and 16).

21. Nilo's offices, vault, and wholesale services are offered on a higher floor at the same location.  (Testimony of Ms. Yasmine Hussein; Exhibit D; Exhibit 2 at p. 3; Exhibit 15 and Exhibit 16).

22. Nilo also used its retail Rado SIS to showcase to potential Rado retailers Rado's SIS concept.  (Testimony of Ms. Yasmine Hussein).

23. By 2014, Rado was once again seeking that Nilo implement appropriate measures to increase Rado's market share in Puerto Rico.  Specifically, on September 10, 2014, Rado's representatives met with Nilo to discuss options, as Nilo was "running behind last year (-45% in value) and were very conservative due to the transition period."  (Exhibit G).

24. The memorandum summarizing the discussions at that meeting highlighted many issues, including the following areas that Nilo had to implement to fit within Rado's global marketing strategy, to wit:

   a. Select the appropriate distribution network in line with RADO's price ranges:

      i. Create a [Point of Sale or] POS mapping of the island with a ranking by business potential, as well as nominating the ones to be closed.

   b. Focus on introducing SIS in the best POS, including an "open budget package," with automatic replenishment.

> c.  Increase the new brand awareness with marketing actions and Puerto Rico events.
>
> d.  Order new products.
>
> e.  An urgent MUST: organize staff training on new products.
>
> f.  Project of RADO SIS in Old San Juan on progress.
>
> g.  Explore options for open SIS either in [Plaza Las Americas] or in Mall of San Juan (to be opened March 2015).
>
> h.  Prepare an "exit strategy" for some Zales & Gordon's, JC Penney POS, to avoid image damages.
>
> i.  Reduce current stock of the Original [Rado model].

Id. at p. 3.

25. Rado continued to make similar requests from Nilo requiring a higher-end network of retailers, an ample portfolio of Rado products, organizing appropriate staff-training and reducing its stock of the Rado Original Model throughout the years, to no avail.  (Testimony of Mr. Adrian Bosshard).

26. Nilo did attempt to implement some measures in accord with Rado's expectations.  Specifically, in May 2017, Nilo opened an exclusive Rado boutique in Old San Juan.  (Stipulation of Fact at ¶ 4).

27. The opening of the store, with a chocolate theme and the presence of some local celebrities, was covered by the local press, and Nilo had high hopes for this new business endeavor.  (Testimony of Ms. Yasmine Hussein; Exhibit 2).

28. However, a mere two-months later, by July 11, 2017, Nilo was sharing with Rado "the financial results of the Rado boutique in Old San Juan and [its] concerns on the lack of profit." (Exhibit 3).

29. Soon thereafter, in September 2017, Hurricane María impacted Puerto Rico, a *force majeure* event that Nilo acknowledges cannot be imputed to Rado. (Testimony of Ms. Yasmine Hussein).

30. As a result, the Rado Boutique in Old San Juan was without electricity for many months and there were no cruise ships visiting Puerto Rico, reducing foot traffic in the area and further negatively impacting Rado boutique's sales. Id.

31. The combination of low sales, low prices to compete with some on-line sales and low traffic after Hurricane María lead to the eventual closure of the boutique store in Old San Juan. Id.

32. In 2019, Nilo faced what it viewed as another hardship. Specifically, Rado implemented a worldwide price-increase that impacted Nilo negatively, requiring it to sometimes sell at a loss under its wholesale price structure. Id.

33. Nilo conveyed this situation to Rado during a meeting in early 2019, where it also highlighted Puerto Rico's economic situation after Hurricane María. (Id.; Exhibit 5 at pp. 2-3).

34. Rado implemented a second price increase worldwide in 2021, with the same negative impact on Nilo's wholesale profit margins.[1] (Exhibit 6).

---

[1] Nilo's testimony during the hearing, however, failed to address how Nilo set up its wholesale pricing after Rado's price increases and why it had to sell at a loss as a result of the same.

35. In between those price increases, specifically in early 2020, the COVID Pandemic and a government-mandated shutdown took place in Puerto Rico, another *force majeure* event that Nilo acknowledged cannot be imputed to Rado.  (Testimony of Ms. Yasmine Hussein).

36. Both Rado and Nilo were impacted by those shutdowns.  (Testimonies of Mr. Adrian Bosshard and Ms. Yasmine Hussein).

37. In Puerto Rico, a complete shutdown commenced on March 15, 2020.  Even when a "slow opening" was allowed by the government some months later, many of Nilo's employees did not want to return to work, as they were scared.  (Testimony of Ms. Yasmine Hussein).

38. While Rado used most of 2020 to plan for the normalization of business in 2021, Nilo did not forward to Rado a marketing plan for 2021 until the third quarter of 2021, well after the year had started.  (Testimony of Mr. Adrian Bosshard).

39. Nilo's communications plan was not forwarded to Rado until August 19, 2021.  (Exhibit 7 at p.1).  This was another departure from the standard practices of Rado's agents or distributors all over the world, entities that usually provide such plans for Rado's approval by the end of the prior year or early in the year when such plan is to be implemented.  (Testimony of Mr. Adrian Bosshard).

40. Even taking the years 2017 (given the impact of Hurricane María) and 2020 (given the COVID shutdown) out of the equation, Nilo's purchases from Rado consistently declined since 2005 up to 2021, as shown by the following data:

| Cal. Year | Qty Sell-in | Value CHF |
|---|---|---|
| 2002 | 20,105 | 6,238,505.00 |
| 2003 | 21,483 | 6,684,508.00 |
| 2004 | 25,816 | 8,614,715.00 |
| 2005 | 22,176 | 7,500,683.00 |
| 2006 | 15,506 | 6,140,844.00 |
| 2007 | 12,379 | 3,939,223.00 |
| 2008 | 7,364 | 2,862,742.00 |
| 2009 | 4,878 | 1,890,011.00 |
| 2010 | 3,643 | 1,099,214.00 |
| 2011 | 1,788 | 584,269.00 |
| 2012 | 1,172 | 534,012.00 |
| 2013 | 1,324 | 513,491.00 |
| 2014 | 1,158 | 411,968.00 |
| 2015 | 1,192 | 483,849.00 |
| 2016 | 1,551 | 470,441.00 |
| 2017 | 262 | 109,849.00 |
| 2018 | 604 | 134,216.00 |
| 2019 | 997 | 380,047.00 |
| 2020 | 466 | 237,391.40 |
| 2021 | 860 | 406,394.00 |

Nilo Watch Parts, Inc., v. Rado Watch Co., Ltd.
Opinion and Order
Civil 23-1085 (CVR)
Page 11

| Cal. Year | Qty Sell-in | Value CHF |
|-----------|-------------|-----------|
| 2022 | 1,017 | 560,736.00 |

(Testimony of Mr. Adrian Bosshard; Exhibit C).

41.   The slight improvement percentagewise in 2022 seemed insufficient to alter this clear trend.  (Testimony of Mr. Adrian Bosshard).

42.   During approximately the same time period, Nilo consistently focused its sales efforts on the "Original DiaStar" line or "reloj cebolla", thus failing to align with Rado's worldwide strategy of offering a full gamut of its products, including the important Captain Cook, True and Centrix series. (Testimonies of Mr. Adrian Bosshard and Mr. Miguel Ortiz).

43.   By 2022, none of Nilo's POS were "qualitative" for the brand and went against Rado's guidelines.  (Exhibit 13 at p. 6.)[2]  Specifically, Nilo's POS showed outdated retail concepts such as old merchandise and non-Rado merchandise in Rado's cases; previous marketing concepts (such as old visuals, pillow displays and black furniture); and an inadequate, ineffective and disproportionate product mix, all of which went against Rado's guidelines and the "Swiss Environment" that Rado sought in its POS worldwide.  Nilo was also offering Rado watches on consignment, which was

---

[2] Specifically, one of the messages that Rado's Sebastien Ischi sent to Nilo's Yasmine Hussein informed her that "... none of the POS I visit[ed] was qualitative for our brand anymore. None. In terms of brand mix, way to present the brand, assortment, furniture, visuals, campaigns updates.... the marketing investments were also not smooth over the years as pointed out by Gian Marco in the multiple emails."  (Exhibit 13 at p. 6).

likewise not allowed under the guidelines. (Testimony of Mr. Miguel Ortiz).

44. Notwithstanding Rado's request since at least 2014 to change its distribution network to be aligned with its worldwide standards, Nilo still maintained seventeen (17) POS throughout the island with the SIS concept[3] instead of a "selective, qualitative distribution network," as required by Rado's worldwide guidelines. (Testimonies of Mr. Adrian Bosshard and Mr. Miguel Ortiz; Exhibit B at p. 4).

45. On June 24, 2022, Rado sent Nilo a letter providing Nilo with over six (6) months prior notice of Rado's termination of the existing business relationship, effective December 31, 2022. (Joint Exhibit III).

46. In reaction to Rado's letter, on July 1, 2022, Nilo's legal representative challenged Rado's decision not to renew the distribution agreement with Nilo. (Exhibit 1).

47. Rado promptly wrote back on August 25, 2022. (Exhibit 4). In the second paragraph of this letter, Rado confirmed that its termination decision remained unchanged, and explained that Nilo had consistently refused to implement Rado's plans to market and promote its brand in Puerto Rico. Id. at p. 1. Rado further explained that, because of Nilo's failures, the Rado brand had suffered a steady decrease in sales and market share in Puerto

---

[3] Pursuant to the parties' stipulations, at certain points in time, Nilo sold Rado watches to Zales and Gordon's jewelry stores, as well as department stores owned by Sears Holding Co. and J.C. Penney Company. (Stipulation of Facts at ¶ 3). Sears Holding Co. filed for bankruptcy on October 15, 2018, and J.C. Penney filed for bankruptcy around May 2020. (Stipulation of Facts at ¶ 5). Although Nilo alleged that it eventually lost such retailers (Docket No. 1), no evidence was submitted during the hearing regarding whether the seventeen (17) POS that remained in 2020 included Zales or Gordon's, or what was the impact of the stipulated bankruptcies on Nilo's sales to Sears or J.C. Penney.

Rico, thereby failing to meet the expected growth other similar brands have experienced in Puerto Rico during the same timeframe.  Id.

48.   Notwithstanding these substantial deficiencies, given the long-lasting relationship between the parties, Rado confirmed it was "available to discuss this matter constructively during a meeting with Nilo's management in the [near] future."  Id. at p.2.

49.   Such a meeting took place at Rado's headquarters in Lengnau, Switzerland, in September 2022, followed by a second meeting in Miami, Florida, in November 2022.  (Testimonies of Mr. Adrian Bosshard and Ms. Yasmine Hussein).

50.   During that initial meeting on September 23, 2022, Rado explained its goal of strengthening its collaboration with retailers from within its subsidiaries, to give better service, support and brand experience to its business partners and, to a certain extent, its end-consumers.  (Exhibit 8 at p.3).

51.   Rado offered Nilo the opportunity of continuing its partnership with Rado, "by changing [Nilo's] business model from a wholesale distributor to a retailer model."  Id.

52.   Rado further explained the many advantages it understood Nilo would enjoy with the new business model, including:

    a.   The stock would be delivered from the United States directly with no additional landing costs for Nilo.

    b.   Nilo would receive, at no cost to it, direct support from the brand manager and regional sales manager from Swatch Group United

States in terms of sales, marketing, training, administration, and overall strategy guidance.

c.  Nilo would be able to collect a retailer margin of 45% off the suggested retail price "(as [United States] retailers) [as well as] 10% on wholesale margin (as the other retailers from the Caribbean), which [would mean] a net margin of 50.5% off retail price" with all other costs absorbed by Rado's United States subsidiary.

d.  Rado further confirmed its intent "to help Nilo grow its own retail business" by exceptionally helping Nilo with the financing of "an important part of [its] future … retail franchise boutiques."

Id.

53.  In an email dated September 28, 2022, Nilo advised it was "very interested in continuing doing business with Rado, as [it had] done for decades," and agreed "that the best next step [was] to work on a transition plan to a different business model." Id. at p. 2.

54.  On November 11, 2022, Rado sent Nilo a draft of its standard worldwide non-negotiable Retail Agreement and other documents explaining its retail business model. (Exhibit 10 at p. 10). Rado reiterated that it would "exceptionally help Nilo by financing 100% an important part of their future own retail franchise boutiques." Id. at p.1.

55.  By November 16, 2022, Nilo requested that Rado withdraw the termination notice, so that a lengthier negotiation period could take place, without the "pressure" of the termination process or a potential legal case.

(Exhibit 11 at pp. 2-3).

56.   Nilo's representative testified that they were extremely concerned that becoming a non-exclusive Rado retailer would not be viable for the company.  (Testimony of Ms. Yasmine Hussein).

57.   Nilo was also concerned about the transition process, as well as Rado's potential plans to open other Rado stores in competition with them. (Exhibit 11).

58.   On November 23, 2022, Rado expressed it was "quite surprised" by this latest communication from Nilo.  Id. at p.1.  Rado confirmed that it was "ready to build together with Nilo a renewed partnership", and that it was amenable to a side agreement (the "Side Agreement") "integrating an appropriate transition and business plan" to give Nilo "full support" in this process.  Id.; (Testimony of Mr. Adrian Bosshard).

59.   A few days later, via an email dated December 2, 2022, as part of the Side Agreement, Rado provided Nilo with a business plan as an additional incentive, which detailed the timeline and actions Rado would take to assist Nilo in transitioning from a distributor to a retailer because Rado understood that the Puerto Rico market needed special support. (Testimony of Mr. Adrian Bosshard, Exhibit 12).

60.   Among other things, the plan provided that:

a.   Nilo would remain as Rado's wholesaler during 2023, buying from Rado's Swiss headquarters, while it closed unsuitable POS and

        geared up its own Rado boutique and two pop-up kiosks, with furniture paid 100% by Rado.

    b. By 2024, Nilo would purchase goods from Rado's United States subsidiary and concentrate only on its role as a retailer.

    c. During 2025 and 2026, Nilo would explore opening another Rado boutique yearly, again with furniture paid 100% by Rado.

    Id.

61. This offer to finance 100% of Nilo's future furnishings in up to three (3) stores was different from the standard 50% financing offered by Rado to its other retailers around the world.  The terms of the Side Agreement were exclusive to Nilo.  (Testimony of Mr. Adrian Bosshard, Exhibit 11).

62. Rado's position as to Nilo's actions was that "the current status of the brand in wholesale is damaging the brand perception. And frankly, you see your sales dropping from one year to the other... Something strong has to be done to reactivate the brand."  (Exbibit 13 at p. 7).

63. Rado was looking to close other outlets in Puerto Rico that sold the Rado brand at a less exclusive level.  In other words, Rado sought to have less POS and a higher quality of sales, all in the "Swiss Environment" which Nilo had been unsuccessful in establishing.  (Testimony of Mr. Adrian Bosshard).

64. On December 21, 2022, Nilo emailed the Rado team with a preliminary reaction to the business plan shared by Rado, alleging that it was still "unclear" regarding the transition process, seeking the exclusivity of the Rado brand and Rado's plans for it in Puerto Rico, and seeking reassurances

that Nilo would be allowed to continue operating a Service Center for Rado watches in Puerto Rico.  (Exhibit 14).

65.   In a reply dated December 28, 2022, Rado attempted to ease those concerns by answering, among other things: "[y]ou are our partner on the island [Puerto Rico] like our partners in St-Marteen, in Aruba, in Jamaica, … None of them have exclusive contracts but our commitment together is durable and we are strongly and positively developing local business." Id. at p.1.

66.   None of Rado's reassurances were sufficient to ease Nilo, as Rado's insistence that the retail agreement was non-negotiable led Nilo to believe the other discussed terms in the Side Agreement could simply change at Rado's discretion.  (Testimony of Ms. Yasmine Hussein).

67.   Nilo did not sign the new retail agreement proposed by Rado.  Id.

68.   As forewarned in Rado's termination letter, the distribution relationship between Rado and Nilo ended on December 31, 2022.  (Joint Exhibit III).

69.   Mr. Miguel Ortiz, Rado's Brand Manager for the United States and the Caribbean, was born and raised in Puerto Rico, where he has family and travels often as part of his professional duties.  Part of his responsibilities entail to execute Rado's global brand strategy and ensure all the brand's standards are met for his territory.  This includes the distribution of Rado's products in Puerto Rico.  (Testimony of Mr. Miguel Ortiz).

70.   After the termination became effective, Rado quickly developed a plan to relaunch its brand in Puerto Rico and to elevate the brand via distribution through its United States' subsidiary.  (Testimony of Mr. Miguel Ortiz).

71.   As part of these plans, Mr. Miguel Ortiz:

    a.   In April 2023, visited a limited number of current POS in Puerto Rico that he anticipated maintaining from the former distribution network, specifically, only four (4) of the seventeen (17) POS Nilo had.  (Testimony of Mr. Miguel Ortiz; Exhibit I at p. 3).

    b.   Concluded that the Rado brand in Puerto Rico is "overdistributed and not represented in the Key Luxury Jewelers on the Island." (Exhibit I at p. 2).

    c.   Confirmed that the "Current Product Mix does not align with the Global Brand Direction." Id.

    d.   Ascertained the need to update the marketing materials, furniture, and product portfolio of the existing POS, as the "existing SISs are all previous generation."  (Testimony of Mr. Miguel Ortiz; Exhibits H and I at p. 2).

    e.   Contacted four (4) new potential POS that meet Rado's qualitative standards and that had expressed interest in becoming a Rado retailer.  (Testimony of Mr. Miguel Ortiz; Exhibit I at p. 3).

    f.   Developed a media plan to promote the brand in Puerto Rico in accordance with Rado's worldwide guidelines.  (Testimony of Mr. Miguel Ortiz; Exhibit I at p. 2).

72.   Rado has yet to implement these plans in deference to the on-going court proceedings.  However, a continued delay of such implementation will prolong the already existing damage to Rado's brand that has already been

created by Nilo's past practices.  (Testimony of Mr. Miguel Ortiz, Exhibit I at p. 2).

## LEGAL STANDARD[4]

### A.   Law 75.

Puerto Rico's Law 75 governs the business relationship between principals and their locally appointed distributors who market their products in Puerto Rico.  See Caribe Indus. Sys., Inc. v. Nat'l Starch and Chem. Co., 212 F.3d 26, 29 (1st Cir. 2000); Irvine v. Murad Skin Rsch. Labs., Inc., 194 F.3d 313, 317–18 (1st Cir. 1999); Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc., 399 F.Supp.2d 57, 70 (2005).  The provisions of Law 75 were intended to protect Puerto Rico's dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products "frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities." Id. at 72 (quoting Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 820 (1st Cir. 1988)); see also Alina & A Tours, Inc. v. Royal Caribbean Cruises, Ltd., Civil No. 06-1009, 2006 WL 897975 at *8 (D.P.R. Mar. 31, 2006).

To avoid the inequity of the arbitrary termination of a distribution relationship, once a distributor has developed a local market for the principal's products or services,

---

[4]  In Rado's pleading papers, it offered an additional reason to deny Nilo's request for injunctive relief, to wit, the doctrine of laches.  Rado argued that Nilo was informed in June 2022 that Rado would terminate the relationship effective December 31, 2022, and Nilo waited until eight (8) months after such notice, and after termination of the relationship, to seek relief from this Court in February 2023.  Rado argues that the laches doctrine which "penalizes a litigant for negligent or willful failure to assert his rights" precludes Nilo's claims now, because its inaction would make it improper for this Court to grant the injunctive relief requested.  Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972).  Since the Court is denying Nilo's request for injunctive relief on the merits, it does not reach this additional ground proffered by Rado.

Law 75 limits the principal's ability to unilaterally end the relationship except for "just cause."  P.R. Laws Ann. tit. 10, § 278a; Freightliner, L.L.C., 399 F.Supp.2d at 70-71.  Thus, "once a dealer demonstrates that its principal unilaterally terminated their contract, the principal must carry the burden of persuasion on the factual elements of the 'just cause' showing."  R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 52 (1st Cir. 1996).  Accordingly, to prove a violation of Law 75, Nilo must show that it is a dealer [5]  and that Rado, its principal, refused to renew or impaired the terms of the existing contract between the parties to Nilo's detriment.  Once Nilo meets this burden, Rado may avoid liability by establishing that it had just cause for the non-renewal or impairment of the contract.  Id.

### B.    Injunctive Relief under Law 75.

Under Law 75, the moving party has the burden of showing why the preliminary injunction should be granted.  See Freightliner, L.L.C., 399 F.Supp.2d at 70-71; Picker Int'l. v. Kodak Caribbean, Ltd., 826 F.Supp. 610, 613 (D.P.R. 1993).

> Black letter law in this circuit instructs that district courts ordinarily are to determine the appropriateness of granting or denying a [Law 75] preliminary injuction on the basis of a four-part test that takes into account (1) the movant's likelihood of success on the merits, (2) the potential Black letter law in this circuit instructs that district courts ordinarily are to for irreparable injury, (3) a balancing of the relevant equities, and (4) the effect on the public interest.

Sistemas Urbanos, Inc. v. Ramos, 368 F.Supp.2d 160, 162 (D.P.R. 2005) (citing DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998)).

---

[5] There is no dispute in the present case that Nilo was an exclusive distributor of Rado's products in Puerto Rico, and thus, properly a "dealer" under the Act.

This is the so-called "classic injunction" standard, and although not to be strictly applied, this traditional four-factor test should rule the Court's analysis.  See New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir.2002); Prime Wholesalers, Inc. v. Fields Motorcars of Fla., Inc., Civil No. 08-1640, 2009 WL 2612519, at *9 (D.P.R. Aug. 17, 2009) ("[C]ourts must examine the interplay between the traditional criteria for injunctive relief and the relevant provisions of [Law 75].") (citing Freightliner, L.L.C., 399 F.Supp.2d at 72); Alina & A Tours, Inc., 2006 WL 897975, at *7 (employing traditional four-part test under Act 75 and citing authorities).   "These traditional criteria apply equally to Act 75 cases, as long as they are tempered to the purposes of the [*sic*] such Act." Freightliner, L.L.C., 399 F.Supp.2d at 61 (citing Systems de P.R., Inc. v. Interface Int'l, 123 D.P.R. 379 (1989)).

The Court is cognizant of the Puerto Rico Supreme Court's holding in Next Step Medical v. Bromedicon, Inc., 190 D.P.R. 474 (2014), where it found that the classic preliminary injunction elements need not be strictly applied in Law 75 cases, but rather, were to be interpreted more liberally to meet the public policy ends of the Act.   This is what the Puerto Rico Supreme Court labeled the "statutory injunction" where the moving party must: 1) establish the public impact that granting the injunction will have; 2) detail the reasons why the relationship should be maintained; and 3) demonstrate the nature of the damages that the denial of the injunction might cause.   Next-Step, 190 D.P.R. at 498.

The Court of Appeals for the First Circuit furthered this holding in the landmark case of Waterproofing Sys., Inc. v. Hydro-Stop, Inc., 440 F.3d 24, 33 (1st Cir. 2006), where it noted that "a preliminary injunction under this statutory provision is not necessarily tied to a showing of irreparable injury or to probability of success in the case

on the merits, but rather to the policies of the Act in promoting the continuation of dealership agreements and the strict adherence to the provisions of such agreements." "Indeed, it is hard to see how an injunction would further the policies of the statute if it prevented a principal from taking an action that the statute allows." José Santiago, Inc. v. Smithfield Packaged Meats Corp., 66 F. 4th 329, 336 (1st Cir. 2023).

Therefore, to the extent that Law 75 requires this Court to look both to the parties' "interests" and to the Act's "public policy", the basic policy of the Act is to prevent dealer termination without "just cause", which must therefore guide the Court's analysis. See Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir. 1984). For these reasons, the Court finds that the Act's purpose in furthering the "continuation of dealership agreements and the strict adherence to the provisions of such agreements" are closely intertwined with the analysis the Court must make regarding the traditional injunction elements. Id.

Under the classic injunction standard, the discussion of the likelihood of success on the merits must address whether there was just cause for Rado's actions. This element is met for the statutory injunction when the Court considers the Act's for strict adherence to the provisions such agreements require and the need to further them. Id. The impact on the public interest element stands on its own under both standards, and for the statutory injunction, also includes the reasons Nilo must present in support of maintaining the current relationship. The classic injunction element of the nature of the harm, irreparable or otherwise, to be suffered by Nilo is paralleled in the statutory injunction requirement that Nilo must show the damages that the denial of the relief requested might cause. Finally, the Puerto Rico Supreme Court case of Next-Step

Medical v. Biomet, 195 D.P.R. 739, 754 (2016) also found that the Court must balance the interests between the parties.

## ANALYSIS

The Court examines Nilo's request for preliminary injunctive relief with this legal framework in mind.

1. Likelihood of success on the merits.

As previously mentioned, although the traditional common law test for a preliminary injunction does not strictly apply, "the court's view of the merits would certainly affect its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies." Waterproofing Sys., Inc., 440 F.3d at 33 (citing Pan Am. Computer Corp. v. Data Gen. Corp., 652 F.2d 215, 217 (1st Cir. 1981)).

In assessing the likelihood of success on the merits of Nilo's claims, the Court is mindful that, where appropriate circumstances are present, "Law 75 [does] not bar termination of distributorship contract." Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 15 (1st Cir. 1996). The statute does allow for termination when "just cause" is present, which is defined as:

> Nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part *that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service.*
> P.R. Laws Ann. tit 10, §278 (d) (emphasis added).

The presence [or absence] of just cause affects the consideration of the public policy objectives of the Act and the parties' interests for purposes of the request for provisional remedies under Article 3-A of Act 75. Freightliner, L.L.C., 399 F. Supp. 2d at 78. Thus, "Law 75 should not be interpreted to create a 'safe-haven' for dealers to avoid

the express terms of the contracts to which they willingly subscribed.'" <u>Medina & Medina, Inc. v. Hormel Foods Corp.</u>, 840 F.3d 26, 41 (1st Cir. 2016). "Of course, just as the parties' agreement may circumscribe the extent of the dealer's rights, so too the agreement, by allowing certain conduct or inaction by the dealer, may circumscribe the ability of the principal to deem such conduct or inaction just cause." <u>José Santiago, Inc.</u>, 66 F.4th at 337-38.

In the present case, there was no written contract governing the relationship between the parties, but rather, a letter confirming Nilo's designation as the local Rado distributor. <u>See</u> Joint Exhibit II. "When there is no written agreement, a contract's terms must be discerned by the parties' course of dealing." <u>José Santiago, Inc.</u>, 66 F.4th at 339. The Court thus looks at the course of dealings from the communications exchanged between the parties throughout the years.  These communications show Rado's expectations that Nilo would align itself to Rado's worldwide distribution standards, and Nilo's consistent failure in the last decade to meet such goals and standards.  In those communications, as well as in the testimony of its representative during the hearing, Nilo did not challenge Rado's rights to establish such goals, but rather, attempted to excuse its failure to fulfill them upon *force majeure* events, such as Hurricane María and the COVID-19 pandemic, and upon its claimed knowledge of the Puerto Rico market.

However, it is evident that Nilo's purported knowledge of the local market was insufficient, as its sales plummeted to bare minimums over the last fifteen (15) years. Thus, even though Nilo argued in its defense that Rado never gave it a sales quota it had to comply with, the reality is that since 2006, Nilo's sales numbers began to decrease substantially and never recovered.  Moreover, it is also clear that to be successful on a

worldwide basis, Rado's marketing must be consistent throughout the world. Nilo's attempt to maintain the Puerto Rico market highjacked to its vision of promoting the entry-price level "Original" Rado model (known locally as the "cebolla" watch) above-and-beyond the remaining portfolio of the Rado models that are the core of its sales elsewhere was contrary to Rado's interests "in promoting the marketing or distribution" of its products. *Cf.* V. Suárez & Co., Inc. v. Dow Brands, Inc., 337 F.3d 1, 8 n.11 (1st Cir. 2003) (giving a dealer power over a principal's legitimate business decisions "is even harder to justify where the plaintiff dealer plays a rather minimal role in the principal's overall distributor network").

The evidence and the testimony presented during the preliminary injunction hearing established that Rado is likely to succeed on a showing of just cause for terminating its relationship with Nilo. In support of this were Nilo's lackluster sales performance in recent years, its lack of receptivity to any suggestions from Rado that would improve its performance, its failure to implement satisfactory marketing strategies, and its consistent challenges to Rado's worldwide decisions and strategies. Rather than strive to improve its performance, Nilo attempted to subvert Rado's worldwide practices by attempting to impose its own conditions and to govern Rado's sales policies, telling Rado that it did not know the Puerto Rico market. In the end, Nilo's actions were adversely affecting Rado's interests in promoting the marketing and distribution of its product, the main element a just cause termination must look to address. Under these circumstances, and as amply evidenced by the multiple communications exchanges between the parties throughout the years, the Court cannot find that Nilo's actions promoted the continuation of the agreement as called for under the Act.

For these reasons, the Court holds that Rado is likely to succeed on a showing of just cause in this case and Nilo is unlikely to succeed on the merits of its claim.

2.    Irreparable harm.

It has long been recognized that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937 (1974).  Such is the situation in the present case, where Nilo's evidence failed to establish the nature of any irreparable harm to the company, nor was there any showing as to why the monetary damages claimed in the Verified Complaint would be an inadequate remedy for its alleged injuries.

During the hearing, Ms. Hussein confirmed that almost eight (8) months after the effective termination date, Nilo continues to sell its existing Rado inventory and other products.[6]  Ms. Hussein further confirmed Nilo's continued interest in representing Rado in Puerto Rico, but the only imminent impact of the denial of the preliminary injunction that she identified was the likelihood that Nilo would have to let go some of its personnel.[7] No concrete injury that could not be redressed via future monetary damages, if appropriate, was identified.  In fact, during cross-examination from Rado's counsel, Ms. Hussein affirmed that Nilo's damages could be redressed monetarily.

Since Nilo continues to operate and remains in business with the Swatch brand, even after termination of the agreement, it did not establish irreparable harm.  See

---

[6] See also Verified Complaint (Docket No. 1 at ¶44).

[7] Ms. Hussein also addressed other potential outcomes if the Swatch brand was taken away from them, which were speculative at this juncture.

Lanvin, Inc. v. Colonia, Inc., 739 F. Supp. 182, 193 (S.D.N.Y. 1990) (where a terminated distributor sells other brands, termination of one brand does not establish irreparable harm); Foreign Motors, Inc. v. Audi of America, Inc., 755 F. Supp. 30, 33 (D. Mass. 1991) (loss of one franchise is insufficient to establish irreparable injury to multi-franchise dealer, and monetary damages are an adequate remedy).   On the contrary, as mentioned above, during cross-examination, Nilo's representative admitted "that money damages are sufficient to remedy the harm … purportedly suffered." Ginzburg v. Martínez-Dávila, 368 F.Supp.3d 343, 348 (D.P.R. 2019) (finding absence of irreparable harm where monetary recovery was the basis for request for injunctive relief).

Ms. Hussein testified that Nilo would be forced to dismiss some employees if the injunction were not granted.   Nonetheless, no further evidence of any harm was presented.   Ms. Hussein also testified that Rado had only sought to terminate the exclusive distributorship for Rado watches and there was no issue with Nilo continuing to distribute the Swatch brand.   Furthermore, considering Nilo's sales of Rado watches have substantially decreased over the years, it is hard to argue that Rado's termination will cause such detrimental and catastrophic damages that cannot otherwise be remedied.

Under these circumstances, this element does not favor Nilo either.

3.   The balance of interests.

To determine the balance of the interests, the Court must ascertain whether reinstating the commercial relationship between Nilo and Rado outweighs the harm a preliminary injunction would inflict on Rado.   See New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d at 8-9); see also Narragansett v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

In the case at bar, Nilo's interest is limited to attempting to temporarily reinstate an already defunct relationship, as Nilo's role as a Rado wholesaler or distributor was terminated effective December 31, 2022. While some initial economic hardship is likely, the same may be compensated monetarily should Nilo eventually succeed on the merits, even if that seems unlikely at this stage, as admitted on the stand by Ms. Hussein.

Rado, however, has satisfactorily established that reverting to the distribution of its Rado watches through the limited Nilo distribution network and its minimal marketing practices will continue to decay its brand and reinforce the already under-valued Rado reputation in Puerto Rico. Albeit in the context of other statutory schemes, it has been held that, "[b]y its very nature, injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 20 (1st Cir. 1996); see also Total Petroleum Puerto Rico Corp. v. Colón-Colón, 577 F.Supp.2d 537, 552 (D.P.R. 2008).

Additionally, since April 2023, Rado also has a marketing and expansion campaign already in place, which is awaiting the resolution of the present case to be launched. Contrary to Nilo's long-standing defense that Rado did not know the Puerto Rico market, since the Verified Complaint was filed in February 2023, Mr. Miguel Ortiz, Rado's Brand Manager for the United States and the Caribbean, quickly moved to reposition Rado in Puerto Rico. Among others, he analyzed the necessities for updated marketing materials, furniture, and product portfolio of the existing POS; contacted new potential POS who expressed interest in becoming Rado retailers; and developed a new media plan to

promote the brand in Puerto Rico, all in accordance with Rado's existing worldwide guidelines.

Consequently, the balance of the interests favors Rado.

4.   The public interest.

As previously mentioned, "[a] preliminary injunction under [Article 3-A of Law 75] is not tied to a showing of irreparable injury or to probability of success in the case on the merits, but rather to the policies of [Law 75] in promoting the continuation of dealership agreements and the strict adherence to the provisions of such agreements."   José Santiago, Inc., 66 F.4th at 336 (internal quotations and citations omitted). Thus, in assessing whether public policy favors the requested injunctive relief, the Court must weigh the fact that Law 75 was adopted to prevent "... the ill-timed action of domestic and foreign manufacturers who, without just cause, terminate their relationship with their representatives or agents in Puerto Rico as soon as the latter have created a favorable market for their products, thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities." Re-Ace, Inc. v. Wheeled Coach Indus., Inc., 270 F.Supp.2d 223, 230 (D. P.R. 2003).   Just cause necessarily affects the consideration of the public policy objectives of Law 75, as no abusive practice by the principal can be imputed if just cause to terminate the relationship is present. Cf. Pan American Computer Corp. v. Data General Corp., 652 F.2d 215, 217 (1st Cir. 1981).

The Court has already concluded that Rado will likely prevail in establishing that just cause was present to terminate with Nilo.   No public policy inherent in Law 75 can save a dealer from its own omissions.   See Nike Intern. Ltd. V. Athletic Sales, Inc., 689 F.Supp. 1235, 1239 (1988).   Certainly, Law 75 was not enacted to protect a distributor who

has failed to fulfill the basic obligations of its relationship with its principal, that is, actively and effectively promoting the principal's goods in the market, thus ensuring satisfactory sales even when taking into consideration the local market conditions.  See José Santiago, Inc., 66 F.4th at 348 (the principal "has a strong interest in being free to carry out its legitimate business decision.").

Additionally, the evidence presented before the Court does not support a conclusion that Rado terminated Nilo in bad faith, or sought to eliminate it as its distributor as soon as a favorable market was established.  As shown by the available sales data presented during the hearing, the favorable market that Nilo created years ago has been slowly eroding over the years, so that by the time termination became effective on December 31, 2022, it was almost non-existent.

Moreover, considering the decades-long relationship between the parties, Rado offered Nilo an alternate option.  Specifically, Rado made a good faith negotiation attempt, and offered Nilo the opportunity to become a Rado retailer, with substantial support, monetary and otherwise, from Rado in the process of transitioning to a full Rado retail outlet.  Indeed, the First Circuit recently held that "the purposes of Law 75, as interpreted by the Supreme Court of Puerto Rico and this court, do not condone JSI's [the dealer's] efforts to obstruct this legitimate business decision by rejecting Smithfield's reasonable, good faith attempts at negotiation."  José Santiago, Inc., 66 F.4th at 348.

The Court finds this squarely applicable to the present case.  Rado was not attempting to terminate its relationship with Nilo when the latter had created a favorable market for Rado watches, but rather, was attempting to salvage such market, while in good faith giving Nilo the prospect of deriving benefits from such potential recovery in a

different role.  Rado gave Nilo ample notice of its intent to terminate their association and then attempted a good faith negotiation to maintain the longstanding relationship alive.  Country Pride Foods, Ltd., 858 F.2d at 823 ("... the termination of the contract should be done in good faith, must be timely done, with due previous notice...").  Rado even gave Nilo exclusive concessions in the Side Agreement not given to any other Rado distributor to help Nilo during the transition period from distributor to retailer.  Nilo failed to take advantage of this opportunity.

Therefore, Nilo's proffered arguments that the preliminary injunction should be maintained pending a "coordinated transition" period[8] finds no support on this record, insofar as over eight (8) months elapsed between the time Rado notified Nilo of its decision to terminate and when the Verified Complaint was filed in February 2023.  Since that time, an additional six (6) months have elapsed, more than enough time for the transition to have occurred.  Furthermore, Nilo refused to sign the new agreement that would have allowed said transition period to move forward will full financial assistance from Rado.

In sum, Law 75 was not intended to prevent termination of unworkable relationships, but only to prevent arbitrary terminations.  See Sheils Title Co., Inc. v. Commonwealth Land Title Ins. Co., 184 F3d. 10, 15 (1st Cir. 1999).  On these facts, the Court cannot find that the interests protected by Law 75 will be furthered by granting Nilo's request for injunctive relief.  Additionally, a termination grounded on just cause has already taken effect, and Nilo's decision to institute the present lawsuit in the middle

[8] Docket No. 21 at p. 6.

of negotiations for a new and different business relationship makes it evident that the relationship has become unworkable.

Consequently, the public interest does not weigh in favor of granting Nilo's requested injunction.

## CONCLUSION

In view of the foregoing, the Court finds justice would not be served by the reinstatement of the relationship between the parties after it was effectively terminated on December 31, 2022.  Rado has shown a substantial likelihood of success on the merits, and both the parties' interests and Law 75's public policy weigh against the granting of a preliminary injunction in Nilo's favor.   Accordingly, Nilo's "Motion for Injunctive Relief" is DENIED.  (Docket No. 2).

IT IS SO ORDERED.

In San Juan, Puerto Rico on this 7th day of September 2023.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE